# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 3, 2014

## STATE OF TENNESSEE v. RICKEY BELL

**Appeal from the Criminal Court for Shelby County**
**No. 13-00529     John W. Campbell, Judge**

---

**No. W2014-00049-CCA-R3-CD  - Filed February 26, 2015**

---

Rickey Bell ("the Defendant") was convicted by a jury of rape of a child, aggravated sexual battery, rape, and two counts of sexual battery by an authority figure.  The trial court sentenced the Defendant to a total effective sentence of forty-nine years' incarceration.  On appeal, the Defendant argues that the trial court erred in denying the Defendant's motion for a bill of particulars and in allowing proof of certain prior bad acts.  The Defendant also challenges the sufficiency of the evidence supporting his convictions for rape of a child and rape.  After a thorough review of the record, we conclude that the trial court did not abuse its discretion in denying the motion for a bill of particulars and in allowing the admission of proof of prior bad acts. We also conclude that there was sufficient evidence supporting the convictions for rape of a child and rape.  Therefore, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Stephen C. Bush, District Public Defender; Barry W. Kuhn, Assistant Shelby County Public Defender (on appeal); and Constance Barnes, Assistant Shelby County Public Defender (at trial), Memphis, Tennessee, for the appellant, Rickey Bell.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Terre Fratesi, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

This case arises out of alleged sexual misconduct by the Defendant to his daughter, the victim. A Shelby County Grand Jury indicted the Defendant on one count each of rape of a child, aggravated sexual battery, and rape and two counts of sexual battery by an authority figure.

On August 26, 2013, the Defendant filed a motion for a bill of particulars, seeking to have the State provide specific dates for the alleged offenses. The State filed a Tennessee Rule of Evidence 404(b) motion on September 5, 2013, and a written response to the motion for a bill of particulars on September 6, 2013. Prior to jury selection on September 9, 2013, the trial court conducted a hearing on the two motions.

With respect to the motion for a bill of particulars, the State argued that the victim was unable to provide more detailed information for the dates of the offenses of rape of a child, aggravated sexual battery, and two counts of sexual battery. The State provided information that those offenses occurred between the time the Defendant returned to the family home and the victim's thirteenth birthday, and the indictment states those offenses occurred between March 15, 2007, and March 14, 2010. Regarding the rape charge, the State had previously provided discovery related to the rape showing that the victim was seen at Le Bonheur Children's Hospital on August 7, 2012. The trial court denied the Defendant's motion for a bill of particulars.

With respect to the 404(b) motion, the State sought to allow the victim to testify at trial about an incident she witnessed in which the Defendant hit the victim's mother with a belt. The State argued that this incident supported their assertion that the victim was scared to come forward and tell anyone about the Defendant's raping her repeatedly. The State also sought permission to present evidence at trial regarding the Defendant's 2006 conviction for misdemeanor assault by offensive touching. The State explained at the hearing that the Defendant had been charged with rape of a child but ultimately pleaded guilty to assault against the victim ("the 2006 case"). Prior to entering the plea, the Defendant had been incarcerated as a result of the charges against him. He was released for time served when he pled guilty. The State argued that, as a result of the misdemeanor assault conviction, the Defendant had trouble securing employment, the family suffered financial hardship, and the Defendant blamed the victim for the family's financial problems.

The victim testified at the motion hearing. In 2005, she told her mother about sexual misconduct committed by the Defendant. Her mother reported this information to the police.

-2-

The victim confirmed that she testified truthfully in court regarding the events that transpired when she was seven and eight years old. When asked what the Defendant did to her that led to the 2006 case, the victim stated, "He would touch like my breast area, or my vagina, or any other inappropriate area, mostly with his hands." When she was examined at the Rape Crisis Center, the nurse discovered "redness on [the victim's] vagina, or some chaffing." The victim explained that the redness was from the Defendant's trying to insert his penis or fingers into her vagina and also attempting to insert his penis into her rectum. The victim denied ever telling anyone that these events never happened.

The Defendant returned to their home following his incarceration from the 2006 case "around [her tenth] birthday," which was in the spring of 2007. Shortly after he returned he began touching her the same way he did before.

The victim recalled an argument between the Defendant and her mother that occurred in front of the victim and her sister. The Defendant was upset because he could not find a job. During the argument, her mother called the Defendant "a rapist," and the Defendant responded by punching a wall. The Defendant then yelled at the victim, "Am I a rapist, have I ever did [sic] anything to you?" She answered "no" out of fear. The victim also recalled a separate time when the Defendant struck her mother three times with a belt during an argument.

With respect to the victim's perception of the financial impact of the 2006 case on her family, the victim stated, "It made me feel guilty that I told the first time, because before all of that had taken place we were on a good stable level and right after that it just seemed like we were struggling." After the case resolved and the Defendant returned home, he was unable to attain full-time employment. The Defendant blamed her for the family's financial problems. When the victim was asked why she went so long without reporting the Defendant's behavior after he returned home, she stated,

> I felt like I didn't want to put my family through the situation again. And the first time I noticed that my mom, she really didn't believe me the first time and I didn't feel like I got the justice, for the first time and I felt like it was no reason to come back with it, again.

On cross-examination, the victim acknowledged that the Defendant started his own car-washing business when he returned to the home and that the family's financial situation improved.

The State argued that they should be allowed to present testimony concerning the events that led to the 2006 case to explain why the victim did not report the sexual abuse

-3-

sooner, to prove a settled purpose to harm this particular victim, and to show motive, intent, and identity. The Defendant argued that the danger of unfair prejudice outweighed the probative value of such evidence.

At the conclusion of the hearing, the trial court took the matter under advisement. Before jury selection, the trial court ruled that the situation involving the Defendant's hitting the victim's mother with a belt would not be relevant at trial and was inadmissible under Tennessee Rule of Evidence 404(b). With respect to the Defendant's conduct that led to the 2006 case, the trial court stated,

> [The victim] testified about this prior incident. This prior incident resulted in a conviction for assault. Based on the case law the Court finds that this - the subject matter of this testimony would be admissible under 404B.

> I think the Court finds that we have the same victim involved. The Court feels it goes to the intent of the defendant as well as motive, as well as the fact that he is singling out a particular individual.

> And it goes back to State versus Smith[1], and State versus Guinn[2] in talking about there is a settled purpose to harm the victim.

> I think that it is also significant in this case from the context that there was another minor child in the home at the same time, but was, apparently, not victimized.

> So we have this prior conduct towards this one particular individual and then that conduct continued on. So I do think that it does go to intent and motive, as well as the indicative willingness to harm this particular victim, as well as settled purpose to harm this particular victim.

> The Court finds that the evidence involving this other act, these other acts are clear and convincing, the Court makes that finding. As well as that the probative value of this testimony of this proof is not outweighed by the prejudicial effect.

---

[1] State v. Smith, 868 S.W.2d 561 (Tenn. 1993).

[2] State v. Jermaine Gwin, No. W2007-02050-CCA-R3-CD, 2009 WL 2970720 (Tenn. Crim. App. Sept. 15, 2009), perm. to app. denied (Tenn. Feb. 22, 2010).

Accordingly the trial court admitted testimony regarding the 2006 case at trial.

The Defendant proceeded to a jury trial on September 9-12, 2013. Jayelon Carr testified that she was currently a student at Delta State University. She had graduated from Overton High School, where she and the victim became friends through the school's music program. Ms. Carr had never been to the victim's house and had never met the Defendant. However, the two girls would call and text each other.

Ms. Carr recalled that August 6, 2012, was the first day of the school year and that the victim did not come to school that day. At approximately 3:30 p.m., the victim called Ms. Carr and told her why she had not been there. The victim made Ms. Carr promise that she would not tell anyone what she had told her. She and the victim spoke again that evening. Ms. Carr remembered being "scared" that something else might happen to the victim.

The next morning at school, one of the guidance counselors approached Ms. Carr about a matter unrelated to the victim, and she told the guidance counselor what the victim had told her. Ms. Carr was then questioned by school officials and the police about what the victim had told her. Ms. Carr confirmed that, even though she broke her promise and told the victim's secret, the two of them remained friends.

On cross-examination, Ms. Carr stated that she never noticed the victim being depressed or sad. On redirect examination, however, she agreed that the victim was "serious" when she described what had happened to her. Ms. Carr also agreed that the victim knew that she had a "strong personality" and would not "let it ride" if she heard something like what the victim told her.

Steven Broadway testified that he lived in Memphis and served as the assistant principal at Overton High School. He recalled that Ms. Carr and the victim were in the performing arts program at Overton.

Mr. Broadway knew the victim as an "[e]xcellent student" but recalled one occasion during her freshman year in which she got into a physical altercation with another student. The mothers of the victim and the other student met with Mr. Broadway regarding the incident, and he learned that the mothers attended church together. According to Mr. Broadway, the mothers were able to work out the situation with their daughters amicably, and he believed that the situation had been resolved. The next day, however, Mr. Broadway was outside at the end of the school day and heard the Defendant shouting profanities at the orchestra director. Specifically, he heard the Defendant say, "No one better touch my mother-f***ing kid, I got a damn problem is [sic] somebody at this school's putting their hands on my g**d****d child and I'll come up here and f*** this s**t up." Once the

Defendant got in his car, he yelled similar comments at Mr. Broadway. Mr. Broadway did not respond but simply observed the victim also get into the car and the Defendant drive away. Mr. Broadway confirmed that the victim was present for at least a portion of that incident.

Mr. Broadway was aware of an investigation that began on August 7, 2012, regarding a situation with the victim. He confirmed that the victim was absent from school on that day. On cross-examination, he stated that, although he did not know her exact grades, he knew that the victim was in good academic standing because she would not have been allowed to stay in the performing arts program otherwise.

Officer John Morris with the Memphis Police Department ("MPD") testified that on August 7, 2012, he responded to a situation of "a possible victim of a forcible rape." When he arrived at the house, the Defendant was standing outside. Officer Morris asked the Defendant if he knew the victim, and the Defendant acknowledged that the victim was his daughter. Initially, Officer Morris did not know that the Defendant was the suspect in the situation with the victim.

Officer Morris asked to speak with the victim, and the victim came out of the house shortly thereafter and spoke with Officer Morris. Officer Morris recalled that one other officer was there at the time and that the Defendant did not join in Officer Morris' conversation with the victim.

When questioned by Officer Morris, the victim denied telling any of her friends about an incident that would need to be reported to the police. Eventually, Officer Morris contacted his supervisor, Lieutenant Savage, and learned that the suspect in this case was the Defendant. At that point, Officer Morris determined that he needed to find a more secure location to question the victim. Officer Morris had the victim sit in his squad car and requested a female officer to assist in questioning the victim. MPD Officer Mia Hendree arrived within five to ten minutes and spoke with the victim in the squad car. During that time, Officer Morris and his partner observed the Defendant.

After speaking with the victim, Officer Hendree advised Officer Morris of what the victim had told her. The Defendant was then arrested. The Defendant and the victim were transported in separate vehicles to the sex crimes unit of the police station. When Officer Morris arrived back at the station, the victim said, "Officer I am sorry." He asked her why she was apologizing, and she said, "Well, I didn't tell you the truth at first." Officer Morris then assured the victim that her initial statement to him was "completely understandable, given the circumstances."

-6-

On cross-examination, Officer Morris stated that the Defendant was standing approximately fifteen to twenty feet from him when he initially questioned the victim. He confirmed that they would have been completely visible to the Defendant.

MPD Officer Hendree testified that she responded to the scene because there had been a request for a female officer. After talking with the other two officers at the scene, Officer Hendree spoke with the victim. Because the victim seemed very nervous, she began by asking the victim about school. After speaking for a few minutes about school, Officer Hendree left the victim to speak with the other officers again, but the victim stopped her and motioned for Officer Hendree to return to the car. At that point, the victim proceeded to tell Officer Hendree everything that had happened.

When Officer Hendree returned to speak with the victim, Officer Hendree noticed the Defendant drop his head and then look up at the sky and gesture as though he were praying. After speaking with the victim, Officer Hendree transported the victim to the police station while the other officers arrested the Defendant and transported him to the police station as well. Officer Hendree later transported the victim to Le Bonheur Children's Hospital for physical and sexual assault examinations and to the Department of Children's Services for further interviews.

MPD Officer Christopher Slaughter testified that he currently worked with the crime scene division. On August 7, 2012, Officer Slaughter responded to a call at the Defendant's residence. When he arrived, Detectives Webb and Lawrence from the sex crimes division were already at the home, and they notified him that the victim's mother had consented to a search of the location. Officer Slaughter identified photographs that he took outside and inside the residence. He also identified some items he collected, including underwear, a towel, and a jar of Vaseline; all of which he sealed separately and sent to the property and evidence room.

The victim testified that in August 2012, "[t]he State" instructed her and her sister to move in with her grandmother because "it was not safe for [her] to stay [at home]." She identified her father as the Defendant and stated that, before living with her grandmother, she and her sister lived with her mother and the Defendant at the family home.

The victim stated that her favorite class at school was Orchestra and that she played the violin. In order to stay in the music program, she had to keep her grade point average ("GPA") above a 2.5, which she had maintained throughout the first two years at Overton High School. As a junior at the time of trial, she was not sure how her grades were because of the stress she had related to preparation for trial. The victim stated that, at one point, her GPA had been 4.3 but had dropped to 3.8.

The victim identified by the use of a chart how old she turned on her birthday over a series of years and what grade she was in during August of each year. The victim recalled,

> When I was eight years old I noticed that my dad [the Defendant], he had already been overprotective of me and [my sister] and he would also show more favoritism towards me. And the molestation and the sexual abuse started around that time and I remember telling a friend . . . what happened, we were outside on the playground, it was recess time and I just told her everything that was going on. And her first reaction as telling me to just go and tell. She was telling me to go call the police.

The victim stated that she was in the third grade at this time. She also clarified that the "molestation and the sexual abuse" had been from the Defendant. According to the victim, the first occurrence took place in their living room, where the Defendant touched her breast area under her shirt and touched her vagina with his hand. She stated that this happened on more than one occasion. The victim testified that the Defendant also would try to "space open [the] lips of [her] vagina and try to get in" using his hands or, on occasion, his penis. According to the victim, these events typically occurred in the living room of their house, but sometimes they occurred in her bedroom.

Occasionally, the Defendant would ask the victim to put lotion on his legs and back. He also, according to the victim, "would try to teach [her] to ejaculate him" by "making [her] do a back and forth motion." She expounded, "He would always get . . . this cocoa butter Vaseline and sometimes he would put it on, or he would try to make me put it on for him and would always try to – when I would put my hands on his penis, he would take his hand and help me to ejaculate him."

After the victim told her friend about these events, the Defendant went to jail and the rest of her family remained at the family home. The victim recalled that, while the Defendant was incarcerated, her mother became very strict because she was the sole income-earner in the home. When her mother told the victim and her sister that the Defendant was returning home after approximately a year of incarceration, the victim was excited for him to return but was also afraid that he "would be mad at [the victim] for telling."

When the Defendant returned, the victim's mother told her to "bury" the past and "just leave it alone." The victim was glad that the Defendant was home and stated that, even as of trial, she still loved the Defendant. Also, when the Defendant returned, the victim moved into the guest room and no longer shared a bedroom with her sister. She believed that she was approximately ten years old when the Defendant returned home. After some time, "[t]he sexual abuse began to happen again." The victim testified,

I was in my room and I just remember that it was late at night and I remember him coming into my room and I thought I was dreaming, I mean, I was already asleep. So I just remember him touching me and I was laying on my stomach and he . . . kind of got on top of me and was just hunching my behind.

The victim verified, however, that she was not dreaming and that what happened was in fact real. The victim clarified that, by "hunching," she meant that the Defendant was "on top of [her] and he was using his penis and just going up and down" on her "butt." On "many" occasions, the Defendant asked the victim to masturbate him. She stated, "He would expect me to do it by myself, but sometimes if he felt like I wasn't doing it the right way, he would still try to help me do it." On one of these occasions, the Defendant apparently became frustrated with the victim and "did oral sex on [her]." The victim remembered that this event occurred prior to her thirteenth birthday.

The victim recalled that the Defendant also "would get and use Vaseline whenever he would try to put his penis in [her] butt and, of course, it would never fit in, but he would try to fit his penis inside." In all of these instances, the victim would ask the Defendant to stop, and, according to the victim, the Defendant usually would stop when whatever he was doing "involved his penis." Otherwise, the Defendant would tell the victim, "I'm not going to hurt you, or it's going to be all right, just let me do this."

The victim recalled that the situation with the Defendant got worse after she turned thirteen. She stated, "Instead of him doing oral sex on me, he would make me do it on him." She specifically recalled one occasion in which the Defendant was sitting in his black chair in the living room and he instructed the victim in giving him oral sex. In that instance, the Defendant pulled down his pants and underwear to the middle of his thigh. When the Defendant put his penis in the victim's mouth, the victim's teeth apparently were scraping his penis and he pulled his penis out of her mouth. He then "jacked off and finished."

The victim stated that, during the time that the Defendant was doing all of this to her, he also was trying to start a church that met at their home. He served as the preacher for this church. According to the victim, the Defendant "would pray with [her] right after he would get done doing the sexual stuff with [her]." Specifically, the Defendant would pray, "God can you take this sin away from us," and he would promise the victim that it would not happen again.

The victim recalled that, on one particular occasion, the Defendant confessed at the church service "that he was struggling with a sex thing," and the group surrounded him and "laid hands on him." According to the victim, she thought "he was delivered from what he

was doing to [her]." She confirmed, however, that the Defendant's actions did not cease at that point.

The victim stated that, when she reached the ages of thirteen, fourteen, and fifteen years old, the Defendant stopped allowing the victim and her sister to go anywhere with friends or extended family members. She was allowed to have friends over to her house, but she would not invite her friends to come over because she "was afraid that he would do the same things to them." When asked why she was able to succeed in school in spite of her circumstances at home, the victim responded, "School was my escape place and I knew if I did well in school that I could get far away from home as possible," meaning college.

The victim testified that, in August 2012, she was unable to attend school for the first two days because her registration for classes was incomplete. Accordingly, the victim was at home all day with the Defendant. At one point, the Defendant told her he "got something," and she knew he meant that he had gotten a condom. She observed the Defendant in another room taking off his shirt and pants. She continued,

> And he came in my room and he . . . picked me up from the bed and he had this green towel in his hand. He put the towel on the floor and he picked me up and he put me on the floor and he was telling me that, you know, I'm not going to hurt you.
>
> And I remember just telling him to stop. So I just kept telling him to stop and he just kept saying that he will not hurt me. And all the times before he'd stop, but he didn't stop this time. And I couldn't push his body off of me.
>
> And I knew that I had to go to the orthodontist in about an hour, or so, so he went ahead and just stopped and he got on the phone, like nothing had happened.
>
> . . . After I came from the orthodontist I went in the restroom and I saw like a lot of blood in my underwear and I freaked out.

Soon after the victim came out of the restroom and while the Defendant also was on the phone, she called Ms. Carr, one of her close friends, and told her about what happened. The Defendant had told the victim during this incident that "it didn't go the way he wanted it to and . . . that next time he was going to get another size condom, that it would fit better."

The victim also testified that, during this incident, the Defendant told her to bend over, and "he got his Vaseline and put his penis in [her] butt." The next morning, the victim woke

up to the Defendant's rubbing her breasts and "hunching on [her] butt." Later, after the Defendant left her room, he returned to tell her that police had arrived and said, "[P]lease just don't let them trip you up." When the victim was first questioned by the police, she denied that anything had happened and returned inside the house. When the Defendant asked her why they were here, the victim told the Defendant that someone she knew was in a fight and they were questioning her about her involvement. Shortly thereafter, the police asked the victim to sit in one of the police vehicles.

Eventually, the victim decided that she should tell the police officers the truth about what had happened, so she knocked on the window and told the female officer that she wanted to know if she was still a virgin. This officer asked her more questions, and the victim eventually told her everything. The victim confirmed that she was transported to the police station for questioning and then received a physical examination.

The victim stated that the Defendant would tell her regularly that when she was older, they would run away together and get married. He also told her that he knew that she "had a thing for him" and "that it was okay to admit that [she] liked him in the same way that he liked [her]." The victim stated that her bedroom was the only bedroom in the house without a lock on the door. She recalled that the Defendant blamed her for his going to jail when she was younger and for his inability to find a job once he came back home. She confirmed that the Defendant told her that she "destroyed him."

On cross-examination, the victim stated that she did not tell anyone about these events for a long time because she "didn't want her family going through that, again." She recalled that, after the Defendant returned home from incarceration, he had various jobs over the years but nothing stable. When asked specifically about when the Defendant put his penis in her "butt," she confirmed that he put his penis "inside" and not simply in her "butt cheeks." She also confirmed that a lot of the touching occurred before she turned thirteen years old and before she started menstruating, which began the summer of her seventh grade year.[3] Specifically, she confirmed that the incident in which he performed oral sex on her occurred before she turned thirteen. When asked why she did not tell any of her extended family about these events, the victim responded that she did not have the chance to be around the family members very often.

_____

[3] The victim stated that she began menstruating "the summer of – getting ready for [her] seventh grade year," which would have been when she was twelve years old. The State asked, however, in the very next question, "The summer of your seventh grade year? Between the seventh and eighth?," to which the victim responded, "Yes, ma'am." According to the age charts the victim identified and discussed on direct examination, she turned thirteen years old in March of her seventh grade year.

On redirect examination, the victim testified that she did not tell her mother about the events because she did not want to upset her mother. She identified a picture of herself from when she was seven years old, which was around the time that she reported the Defendant's actions that resulted in the 2006 case. She stated that, when she was that age, she weighed approximately fifty-eight pounds.

Jessica Lynn Marquez, a forensic scientist with the Tennessee Bureau of Investigation ("TBI"), testified as an expert in serology and DNA testing. In this case, she received for testing the following items: "a saliva standard from [the victim]; vaginal and vulvar swabs from the victim and anal swabs from the victim"; "underwear from the victim"; and a green towel. Upon testing these items, Marquez did not find the presence of semen or blood on any of these items. Marquez noted, however, that the use of a condom possibly would prevent the presence of semen on these items. She also provided several other plausible explanations as to why semen and blood many not have been present.

On cross-examination, Marquez noted that she did not conduct DNA testing on the green towel. She stated that the underwear had some fluid in the rear section but confirmed, once again, that this fluid was not blood or semen.

Dr. Karen Lakin, an Assistant Professor of Pediatrics at the University of Tennessee and Medical Director for Le Bonheur Cares team, testified as an expert in child maltreatment, child pediatrics, and sexual assault forensic examinations. She recalled that on August 7, 2012, she examined the victim in this case. When the victim arrived to the hospital, Dr. Lakin interviewed the victim outside the presence of any of the victim's family. From this interview, Dr. Lakin learned the following:

> [The victim] had reported that she initially made a disclosure to a friend that her father had had sex with her at about noon the day prior to my examination. And then, when I asked her well, can you tell me what happened? She disclosed that her father had been molesting her since she was in the third grade and that he had spent time in prison and approximately a year ago he forced her to perform oral sex and then she reported that this was the first episode, meaning the episode that happened at 12:00 o'clock the day prior where there had been both vaginal and rectal penetration and that she did report that there was pain and bleeding after the incident and that . . . a condom was used.

Dr. Lakin confirmed that, from her examination, she found evidence of something that would have caused pain and bleeding. She noted that the victim had reported that, from the time of the alleged assault until the time of the examination, the victim had taken a bath or

shower, "used a genital wipe or wash," and had changed clothes. Regarding specific injuries that Dr. Lakin observed, she testified as follows:

> [The victim] had some areas of tenderness and bruising just over the [sic] both sides but more prominently on the right side of labia majora, which is the – what we call colloquially as the outer lips. And then she had some areas of abrasion in what we term redness or erythema that was on what we call the labia minora, which is internally.
>
> As I proceeded through the exam, i[t] was evident that she had some areas of injury at – we describe it in terms of the face of a clock when I look at the actual vaginal opening in the area of the hymen. So there were two areas that appeared to have some injury which was at what we call 10:00 and 1:00, if you're looking at the face of a clock. When the hymen has trauma, you can lose parts of tissue to it. We call – if the tissue is lost all the way down to the face we call it a transection. And so, there were two areas of her hymen that had areas that appeared to be completely all the way down to the base, which I call a transection.
>
> So, she had two areas and a lot of really bruising and abrasion; abraded areas alongside the vaginal opening. And there were some areas that the mucus membranes of the genital area, when they start to heal, have almost a whitish appearance. The analogy that I use is if you've ever cut the inside of your mouth after several hours if you look at it, initially it's a clean cut and then if you look at it, that mucus membrane tissue starts to get a little bit of a white edge to it. And that appearance is sort of a healing type tissue.

Dr. Lakin testified that the abraded area could be consistent with the victim's reports of having bleeding on the previous day. She identified several photographs taken with a digital camera from her physical examination of the victim. Dr. Lakin stated that she did not find any indication of injury to the victim's rectum. According to Dr. Lakin, however, the absence of injury is not unusual, given the elastic nature of the tissue surrounding the rectum.

Dr. Lakin reviewed the victim's report from her 2005 examination and noted that the victim, in 2005, did not have any lacerations, transections, or bleeding. According to the report, however, the victim did have some erythema, bruising, and "areas of friction, skin break down." Following her examination of the victim in 2012, Dr. Lakin concluded, "[M]y opinion is that she had very specific findings that would support what she reported to me as to what had occurred. The injuries are specific for penetration." Dr. Lakin noted that, in

-13-

many pediatric cases of sexual assault, physical examinations reveal no injury because of the timing of the disclosure and subsequent examination.

Following the conclusion of the State's case-in-chief, the Defendant filed a motion for judgment of acquittal, which the trial court denied. Additionally, the Defendant objected as to the State's election of offenses. Specifically, the Defendant claimed that the victim was too vague as to when the Defendant's actions recommenced upon his return to the home. The State responded that the victim had specified that the initial events took place after he returned to the home but before her thirteenth birthday. After further discussion, the trial court overruled the Defendant's objection. Accordingly, the Defendant proceeded with his case-in-chief. The Defendant chose not to testify.

Stephanie Herd Herbin, a Deputy Court Clerk for the Criminal Court, testified that she had been employed in that position for eight years. Ms. Herbin stated that she assisted the judges and was a keeper of court records. She identified the Defendant's indictment from 2006, in which he was charged with rape of a child, a class A felony. She also identified a corresponding judgment sheet, which indicated that the Defendant ultimately pleaded guilty to and was convicted of the lesser-included offense of assault, a Class B misdemeanor. His sentence was six months' incarceration and a fine of $250.

On cross-examination, Ms. Herbin read the following from the affidavit of complaint: On May 19th, 2005, an eight year old female victim advised the defendant, who is her biological father, came in her bedroom on May 18th, 2005, pulling her shorts down and putting his penis inside of her private, inside of her butt. The victim advised the defendant also rubbed his penis on her face. The victim advised the defendant started having sex with her when she was seven years old. The victim also advised the defendant has rubbed his penis . . . .

. . . .

. . . on her buttocks, the outside of her panties several times and has penetrated her vagina and anus with his fingers. The victim was examined at the Memphis Sexual Assault Resource Center MSARC, by nurse clinical Judy Pinson, who advised the victim's findings were non-specific and her hymen was red.

Following the conclusion of the Defendant's case-in-chief, the State submitted rebuttal proof. Joy Barnes, an official court reporter, testified that she knew another court reporter named Mary Wilde. Barnes identified a transcript from proceedings on July 7, 2006, that appeared to have been prepared by Wilde. She identified this transcript as the guilty plea

-14-

of the Defendant. The State entered this transcript into evidence and concluded its rebuttal evidence.[4]

At the conclusion of the proof at trial, the jury convicted the Defendant of one count each of rape of a child, aggravated sexual battery, and rape and two counts of sexual battery by an authority figure.

At the sentencing hearing, the presentence report was admitted into evidence without objection from the Defendant. Following proof at the sentencing hearing, the trial court merged the second count of sexual battery by an authority figure into the first count. The trial court then found the Defendant to be a Range I offender and sentenced the Defendant to twenty-five years for his rape of a child conviction, twelve years for his aggravated sexual battery conviction, twelve years for his rape conviction, and six years for his sexual battery by an authority figure conviction in Count 4. The trial court ordered the first three sentences to run consecutively to each other but concurrently to the sentence for sexual battery by an authority figure, for a total effective sentence of forty-nine years' incarceration.

The Defendant filed a motion for new trial, which the trial court denied following a hearing. The Defendant timely appealed.

## Analysis

### *Bill of Particulars*

The Defendant argues that the trial court erred in denying the Defendant's motion for a bill of particulars. The State disagrees.

In reviewing a trial court's denial of a motion for a bill of particulars, this Court will reverse that decision only if we determine that the trial court abused its discretion. See State v. Stephenson, 878 S.W.2d 530, 539 (Tenn. 1994). A trial court abuses its discretion "when it applies an incorrect legal standard or reaches a decision that is against logic or reasoning that causes an injustice to the party complaining." State v. Russell, 382 S.W.3d 312, 317 (Tenn. 2012) (citing State v. Gomez, 367 S.W.3d 237, 243 (Tenn. 2012)).

---

[4] The transcript of the plea colloquy shows that the guilty plea took place on Friday, July 7, 2006, and the trial was scheduled to begin on Monday, July 10, 2006. The Assistant District Attorney General asserted that the State made the plea recommendation because "the child had non-specific findings from MSARC, just a little redness. The DNA results came back from a rape kit indicating that there was no DNA connected to this case to Mr. Bell [or anyone else]."

Under Tennessee Rule of Criminal Procedure 7(c), a defendant may request by motion that the trial court direct the State to file a bill of particulars "so as to adequately identify the offense charged." Such a bill of particulars serves the following purposes: (1) it provides a "defendant with information about the details of the charge against him if this is necessary to the preparation of his defense"; (2) it "avoid[s] prejudicial surprise at trial" to the defendant, State v. Byrd, 820 S.W.2d 739, 741 (Tenn. 1991) (quoting State v. Hicks, 666 S.W.2d 54, 56 (Tenn. 1984)); and (3) "it enables the defendant to preserve a plea against double jeopardy." State v. Sherman, 266 S.W.3d 395, 409 (Tenn. 2008) (citations omitted). Where, as in this case, a defendant is appealing the trial court's denial of a bill of particulars, "a defendant is required to allege how the lack of a bill of particulars was detrimental to the defense." State v. Aldrick D. Lillard, No. M2008-00575-CCA-R3-CD, 2009 WL 2951270, at *5 (Tenn. Crim. App. Sept. 15, 2009), perm. app. denied (Tenn. Mar. 15, 2010). On the other hand, "[i]f the needed information is in the indictment or information, then no bill of particulars is required." Id.

Here, the Defendant requested in his motion for a bill of particulars that the State provide with greater specificity the dates of the alleged acts for his underlying charges. At the pretrial hearing, the State argued that the victim was unable to provide more detailed information for the dates of these events than what had already been provided in the indictment and in discovery, except for stating that the events occurred between the time the Defendant returned to the family home when the victim was eleven years old and the victim's thirteenth birthday. In the indictment, the State provided date ranges for the charges of rape of a child and aggravated sexual battery as March 15, 2007, to March 14, 2010, a period of three years from the time the victim was ten years old until the day before her thirteenth birthday. The date ranges for the charges of rape and sexual battery by an authority figure were from March 15, 2010, to August 8, 2012, which was a period of over two years following the victim's thirteenth birthday.

In State v. Byrd, our supreme court discussed instances such as this, where "in a child sexual abuse case involving a victim too young to give exact dates, the child may be able to define the time of the offense by reference to such memorable occasions in a child's life as birthdays, seasonal celebrations and holidays, the beginning or end of the school year, or visitations by relatives." 820 S.W.2d 739, 742 (Tenn. 1991). The court continued,

> If, however, the state is truly unable to give even an approximate time of the alleged offense by means of descriptive reference, a conviction may nevertheless be affirmed if in the course of the trial it does not appear that the defendant's defense has been hampered by the lack of specificity. Conversely, a conviction must be reversed if trial testimony establishes that the state had in its possession, either actually or constructively, additional information that

could have helped pinpoint the nature, time, or place of the offense, and withheld that information from the defendant.

Id.

The Defendant has failed to establish how the trial court's denial of his motion for a bill of particulars was damaging to his defense. At trial, the victim could not recall the exact dates that the Defendant asked the victim to masturbate him or "did oral sex on [her]," but she did remember that these events occurred after he returned home following his incarceration and prior to her thirteenth birthday. According to the victim, she was approximately ten years old when the Defendant returned to the home. She acknowledged that some time may have passed between the Defendant's incarceration and his return to live in the home. Furthermore, the victim stated that the reason she knew that these events occurred before she was thirteen years old was because she recalled these events happening before she started menstruating.

Moreover, the victim testified that these events with the Defendant worsened after she turned thirteen years old. She stated, "Instead of him doing oral sex on me, he would make me do it on him." She recalled a specific instance in which he instructed the victim in giving him oral sex. She also specifically recalled the instance in which he forced her to engage in sexual intercourse with him occurred in August 2012, an instance for which, at the pretrial hearing, both sides indicated that the State had provided discovery. Thus, the State provided, in the indictment and through discovery as much information regarding the dates as would come out through the victim's testimony. Accordingly, the Defendant has failed to establish prejudice demonstrating an abuse of discretion in this regard. Consequently, he is entitled to no relief on this issue.

*Prior Bad Acts*

The Defendant also contends that the trial court committed reversible error in allowing the State to present proof of the Defendant's prior sexual conduct with the victim, which ultimately led to the 2006 case. The State responds that the trial court did not err in admitting this evidence.

When reviewing a trial court's decision to admit evidence based upon its evidentiary relevance, we will not reverse that decision unless the trial court has abused its discretion. See State v. DuBose, 953 S.W.2d 649, 652-53 (Tenn. 1997); State v. Gilley, 297 S.W.3d 739, 758 (Tenn. Crim. App. 2008). Likewise, when the proffered evidence is subject to the procedural requirements of Tennessee Rule of Evidence 404(b) and when the trial court has substantially complied with those requirements, then any decision as to whether to admit evidence under Rule 404(b) will only be reversed for an abuse of discretion. DuBose, 953

S.W.2d at 652; Gilley, 297 S.W.3d at 758. Under an abuse of discretion standard, we will reverse a decision to admit evidence only when the court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999).

Tennessee Rule of Evidence 404(b) provides as follows:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). The effect of this provision is that, "[a]s a general rule, evidence of a defendant's character is inadmissible for the purpose of proving his or her propensity to commit crime." W. Mark Ward, Tennessee Criminal Trial Practice § 22.22, at 624 (2010-2011 ed.). Rule 404(b), however, permits the admission of proof of other acts "for other purposes." Tenn. R. Evid. 404(b). Other purposes for which "other acts" evidence may be admissible include identity, intent, and motive. Tenn. R. Evid. 404, Advisory Comm'n Cmts; State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003).

Evidence offered to show a contextual background need not be excluded under Rule 404(b) simply for the reason that it involves evidence of prior acts. State v. Gilliland, 22 S.W.3d 266, 271 (Tenn. 2000). Contextual background evidence, which contains proof of other crimes, wrongs, or acts, my be offered as an "other purpose" under Rule 404(b) when exclusion of that evidence would create a chronological or conceptual void in the presentation of the case and that void would likely result in significant jury confusion

concerning the material issues or evidence in the case. Id. at 272. When the State seeks to offer evidence of other crimes, wrongs, or acts that is relevant only to provide a contextual background for the case, the State must establish, and the trial court must find, that (1) the absence of the evidence would create a chronological or conceptual void in the State's presentation of its case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice. Id. at 272.

Tennessee courts have recognized the prejudicial impact of proof of a prior act that is very similar to the act for which the defendant is being tried. See McCary, 119 S.W.3d at 243 (noting that, "[i]n those instances where the prior conduct or acts are similar to the crimes on trial, the potential for a prejudicial result increases") (citing State v. Bordis, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995)); see also State v. Adams, 405 S.W.3d 641, 659 (Tenn. 2013) (recognizing that, "in those instances where the prior conduct or acts are similar to the crimes on trial, the danger of unfair prejudice increases") (citing State v. James, 81 S.W.3d 751, 762 (Tenn. 2002)); State v. Rodriguez, 254 S.W.3d 361, 376 (Tenn. 2008) (quoting State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994)).

In this case, the trial court conducted a Rule 404(b) hearing, during which the State adduced proof of sexual misconduct by the Defendant against his daughter that resulted in the 2006 case, proof of sexual misconduct that occurred upon his return to the family home after his incarceration, and proof as to why the victim waited so long without reporting the Defendant's behavior after he returned home. Specifically, when the victim was asked why she went so long without reporting the Defendant's behavior after he returned home, she stated,

> I felt like I didn't want to put my family through the situation again. And the first time I noticed that my mom, she really didn't believe me the first time and I didn't feel like I got the justice, for the first time and I felt like it was no reason to come back with it, again.

At the conclusion of the hearing, the trial court found that a material issue other than conduct conforming to a character trait existed. Specifically, the court determined that the Defendant's conduct that led to the 2006 case was admissible under Rule 404(b) for the purpose of proving the Defendant's intent, motive, and "settled purpose to harm the victim." The trial court placed on the record its reasons for admitting the evidence and found proof of the prior bad acts by clear and convincing evidence. The trial court also recognized the danger inherent in admitting evidence of the Defendant's 2006 conviction but determined that the danger of unfair prejudice did not outweigh the probative value of the evidence.

-19-

Thus, we conclude that the trial court substantially complied with Rule 404(b)'s procedural requirements, and we will review the trial court's decision for an abuse of discretion. Gilley, 297 S.W.3d at 758.

On appeal, the State asserts that the trial court properly admitted evidence of the Defendant's 2006 conviction because "prior bad act evidence may be introduced to show a settled intent to harm." The State also contends that the evidence was properly admitted because it was necessary to establish why the victim waited so long to tell anyone about the Defendant's conduct leading to the present case. As to its first argument, the State relies upon State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993), which states that "violent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." However, the evidence at issue in the Smith was admitted to establish the defendant's motive, which was circumstantial evidence of identity. 868 S.W.2d at 568; see also Neil Cohen et al., Tennessee Law of Evidence § 4.04(9), pp. 4-84 (4th ed. 2000) ("Although motive itself is rarely an issue in a case, it is often circumstantial proof of some other important matter, such as identity, intent, or lack of accident."). Here, identity was not an issue. Moreover, intent was not a necessary element to prove the Defendant's charged offenses. See Tenn. Code Ann. §§ 39-13-504, -527; see also State v. McCary, 922 S.W.2d 511, 514 (Tenn. 1996).

Nevertheless, we agree with the State that the evidence relating to the 2006 case provided a contextual background to the case and was admissible to explain why the victim waited so long to report the Defendant's sexual abuse. The victim's testimony concerning the disruption and impact on her family caused by her reporting the Defendant's abuse in 2006 was highly probative on the issue of the victim's five-year delay in reporting the abuse in the instant case and also, by extension, on the victim's credibility. On cross-examination, the victim was questioned about her lengthy delay in reporting the abuse. Had the victim been prohibited from explaining the reasons for her delay as they related to the 2006 case, this would have created a conceptual void in the State's case that likely would have resulted in significant jury confusion over the issue. We acknowledge that the State elicited the evidence in question during its direct examination, but the Defendant's questions during cross-examination show that the victim's delay in reporting the abuse was a material issue. While the evidence concerning the 2006 case certainly contained proof of other similar crimes, wrongs, or acts by the Defendant, we conclude that the trial court did not abuse its discretion in finding that the probative value of the evidence was not outweighed by the danger of unfair prejudice and in allowing the evidence to be admitted under Tennessee Rule of Evidence 404(b). Accordingly, the Defendant is entitled to no relief on this issue.

The Defendant also challenges the sufficiency of the evidence supporting his convictions for rape of a child and rape. Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our supreme court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

## Rape of a Child

Rape of a child is the unlawful sexual penetration of a victim who is more than three years old but less than thirteen years old. See Tenn. Code Ann. § 39-13-522(a) (2010). Sexual penetration "means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal

openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Id. § 39-13-501(7) (2010).

In its jury instructions, the trial court defined cunnilingus as "a sex act accomplished by placing the mouth or tongue on or in the vagina of another." This Court has determined that, with regard to cunnilingus, "penetration of the vagina is not required." State v. Alec Joseph Mesot, No. M2006-02599-CCA-R3-CD, 2008 WL 732151, at *6 (Tenn. Crim. App. Mar. 14, 2008).

The State elected for this offense the occasion in which the victim alleged that the Defendant performed oral sex on her. In this regard, the victim testified that, prior to the victim's thirteenth birthday, the Defendant would ask the victim to masturbate him on "many" occasions. She stated, "He would expect me to do it by myself, but sometimes if he felt like I wasn't doing it the right way, he would still try to help me do it." On one such occasion, the Defendant became frustrated with the victim and "did oral sex on [her]." The victim recalled that this incident occurred in her bedroom.

Viewing the evidence with the strongest legitimate view in favor of the State, see Harris, 839 S.W.2d at 75, we conclude that the State introduced sufficient evidence for a jury to convict the Defendant of rape of a child.

## Rape

As charged in this case, rape is defined as "unlawful sexual penetration of a victim by the defendant or a defendant by a victim" when "[f]orce or coercion is used to accomplish the act." Tenn. Code Ann. § 39-13-503(a)(1) (2006).

The State elected for this offense the occasion in which the victim alleged that the Defendant vaginally raped her on August 6, 2012. The victim testified that, in August 2012, she was unable to attend school for the first two days because her registration for classes was incomplete. Accordingly, the victim was at home all day on August 6, 2012, with the Defendant. At one point, the Defendant told her he "got something," and she knew he meant that he had gotten a condom. She observed the Defendant in another room taking off his shirt and pants. She continued,

> And he came in my room and he . . . picked me up from the bed and he had this green towel in his hand. He put the towel on the floor and he picked me up and he put me on the floor and he was telling me that, you know, I'm not going to hurt you.

And I remember just telling him to stop. So I just kept telling him to stop and he just kept saying that he will not hurt me. And all the times before he'd stop, but he didn't stop this time. And I couldn't push his body off of me.

And I knew that I had to go to the orthodontist in about an hour, or so, so he went ahead and just stopped and he got on the phone, like nothing had happened.

. . . After I came from the orthodontist I went in the restroom and I saw like a lot of blood in my underwear and I freaked out.

The Defendant had told the victim during this incident that "it didn't go the way he wanted it to and . . . that next time he was going to get another size condom, that it would fit better." The victim also testified that, during this incident, the Defendant told her to bend over, and "he got his Vaseline and put his penis in [her] butt."

Additionally, Dr. Lakin testified at trial that she learned the following information from her interview with the victim:

[The victim] disclosed that her father had been molesting her since she was in the third grade and that he had spent time in prison and approximately a year ago he forced her to perform oral sex and then she reported that this was the first episode, meaning the episode that happened at 12:00 o'clock the day prior where there had been both vaginal and rectal penetration and that she did report that there was pain and bleeding after the incident and that . . . a condom was used.

Dr. Lakin confirmed that, from her examination, she found evidence of something that would have caused pain and bleeding. Regarding specific injuries that Dr. Lakin observed, she testified as follows:

[The victim] had some areas of tenderness and bruising just over the both sides but more prominently on the right side of labia majora, which is the – what we call colloquially as the outer lips. And then she had some areas of abrasion in what we term redness or erythema that was on what we call the labia minora, which is internally.

As I proceeded through the exam, i[t] was evident that she had some areas of injury at – we describe it in terms of the face of a clock when I look at the actual vaginal opening in the area of the hymen. So there were two areas

that appeared to have some injury which was at what we call 10:00 and 1:00, if you're looking at the face of a clock. When the hymen has trauma, you can lose parts of tissue to it. We call – if the tissue is lost all the way down to the face we call it a transection. And so, there were two areas of her hymen that had areas that appeared to be completely all the way down to the base, which I call a transection.

So, she had two areas and a lot of really bruising and abrasion; abraded areas alongside the vaginal opening. And there were some areas that the mucus membranes of the genital area, when they start to heal, have almost a whitish appearance. The analogy that I use is if you've ever cut the inside of your mouth after several hours if you look at it, initially it's a clean cut and then if you look at it, that mucus membrane tissue starts to get a little bit of a white edge to it. And that appearance is sort of a healing type tissue.

Dr. Lakin testified that the abraded area could be consistent with the victim's reports of having bleeding on the previous day.

Thus, viewing the evidence with the strongest legitimate view in favor of the State, see Harris, 839 S.W.2d at 75, we conclude that the State introduced sufficient evidence for a jury to convict the Defendant of rape. Accordingly, the Defendant is entitled to no relief on this issue.

## **Conclusion**

For the reasons set forth above, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

-24-